UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

SEUNG-YONG OK,

                Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION; TYEE CHIN, FORMER PRINCIPAL OF FLUSHING HIGH SCHOOL, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY; LUIS AGUIRRE AMAYA, ASSISTANT PRINCIPAL OF FLUSHING HIGH SCHOOL, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY.

                Defendants.

**COMPLAINT**

**ECF CASE**

18 CV ____

**JURY TRIAL DEMANDED**

Plaintiff SEUNG-YONG OK, by his attorneys, GLASS KRAKOWER LLP, as and for his Complaint against Defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff brings this action seeking monetary and equitable relief based upon Defendants' violations of 42 U.S.C. Section 1983 and New York Civil Service Law Section 75-b (hereinafter "CLS § 75-b") as a result of maltreatment and retaliatory actions taken against him as a Biology/General Science teacher employed by Defendants because he reported his former school principal at Flushing High School, Tyee Chin, for various allegations of fraud and misconduct at the school.

2. Plaintiff seeks economic, compensatory damages and punitive damages to the extent allowable by law, and other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 as this matter involves federal questions.

4. This action's venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391, because the events in question in this matter occurred in Queens, New York and because Plaintiff resides in Queens County.

5. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6. This Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a).

7. Plaintiff previously served a Written Verified Notice of Claim on Defendants regarding his state law claims, which has not yet been adjusted.

## PARTIES

8. Plaintiff is a resident of the County of Queens and the State of New York.

9. At all times relevant herein, Plaintiff was a "public employee" of Defendants within the meaning of New York State Civil Service Law § 75-b(1)(b).

10. At all times relevant herein, Defendant New York City Department of Education (hereinafter "NYCDOE") was a "public employer" within the meaning of New York State Civil Service Law § 75-b(1)(a).

11. At all times relevant herein, Defendant Tyee Chin was the principal of Flushing High School (hereinafter "FHS"), a school within the NYCDOE, until he was removed as FHS principal on October 19, 2017, and assigned to a reassignment center pending disciplinary charges against him.

12. At all times relevant herein, Defendant Luis Aguirre Amaya was the Assistant Principal (hereinafter "AP") of Science at FHS, a school within the NYCDOE.

## STATEMENT OF FACTS

13. Plaintiff has worked for the NYCDOE as a teacher since September 1996.

14. Plaintiff initially taught at William H. Maxwell Vocational High School from 1996 until 2010.

15. In September 2010, he began working at Flushing High School as a Living Environment and Health Careers teacher.

16. From September 1996 until June 2016, Plaintiff received exclusively Satisfactory and Effective annual evaluations based on his performance.

17. Furthermore, in the individual subcomponents in the evaluations Plaintiff received during these school years, he at no point was rated "Developing" or "Ineffective" in any category.

### The 2015-2016 School Year

18. Beginning during the 2015-2016 school year, Tyee Chin became principal of FHS.

19. On December 2, 2015, Plaintiff wrote an e-mail to Defendant Chin regarding a new administrative policy where teachers who had a passing rate of less than 75 percent were mandated to compile paperwork that was excessive and burdensome. Plaintiff and other teachers were concerned that this mandate was punitive and meant to deter teachers from failing students.

20. On this December 2, 2015 e-mail, Plaintiff copied Carmen Fariña, Chancellor of the NYCDOE, as well as the teachers of FHS and several other high-ranking NYCDOE officials.

21. In response, Defendant Chin e-mailed Plaintiff and directed Plaintiff to e-mail him directly and not copy other individuals. Defendant Chin did not address Plaintiff's actual concerns.

22. Following Defendant Chin's e-mail reply, Plaintiff and Defendant Chin publicly exchanged a number of e-mails, and other individuals also e-mailed to express their opinions.

23. On March 28, 2016, Plaintiff wrote an e-mail to Investigator Carmen Sotomayor from the New York City Special Commissioner of Investigations (hereinafter "SCI") about two fraudulent actions by Principal Chin.

24. The first allegation pertained to an illegal quota system disguised as student intervention and parent outreach, in order to pressure teachers to falsely pass students. Defendant Chin wrote memos to and personally met with teachers who had first marking period classes where less than 75 percent of the students passed, and demanded excessive and redundant paperwork that was outside the scope of the Collective Bargaining Agreement for each failing child.

25. As a result of the pressure placed on teachers by Defendant Chin, many teachers simply passed the number of students that Defendant Chin requested, irrespective of whether the students' performance merited passing grades.

26. The second allegation presented by Plaintiff to SCI Investigator Sotomayor on March 28, 2016, involved a warning made by Defendant Chin to teachers on or about March

14, 2016. Specifically, Defendant Chin told teachers that if they wrote negative responses on the annual NYCDOE teacher survey—which is part of the school's Quality Review—the result would be that teacher positions would be lost due to low enrollment. Defendant Chin also pointed out that he purposely chose Quality Review benchmark points for FHS that could be obtained by the teacher's survey, which could get the school off the state renewal list of struggling schools.

27. In response to Plaintiff's e-mail, SCI Investigator Sotomayor informed Plaintiff that the complaint would be transferred to the NYCDOE's Office of Special Investigations (hereinafter "OSI").

28. On or about April 20, 2016, OSI Investigator Cristina Bunch informed Plaintiff that Plaintiff's aforementioned complaint with SCI had been transferred to OSI. Plaintiff proceeded to repeat the allegations to OSI Investigator Bunch. Plaintiff also provided internal memos, audio recordings, and audio transcriptions to OSI Investigator Bunch.

29. During the 2015-2016 school year, Plaintiff obtained a Living Environment Regents passing rate of 81%, which was 19% higher than the average of the rest of the department.

30. Notably, prior to learning of Plaintiff's complaints against him, Defendant Chin signed off on Plaintiff's Highly Effective Measure of Teaching Practice (hereinafter "MOTP") in the 2015-2016 school year.

31. Defendant Chin discovered that Plaintiff was the individual who had complained to OSI and SCI about his conduct.

## Retaliation during the 2016-2017 school year

32. On or about November 1, 2016, Defendant AP Amaya issued Plaintiff a frivolous administrative conference letter following a five-minute walkthrough conducted by Defendant Amaya, Defendant Chin and Ignazio Accardi, Director of School Renewal and now interim-acting principal of Flushing High School, in two consecutive class periods on Halloween day. Prior to this, Plaintiff had no disciplinary letters to file in his personnel file.

33. Although AP Amaya claimed verbally and in writing that all Living Environment teachers were observed on Halloween Day, Plaintiff surveyed teachers and discovered that no other science teacher was observed besides himself that day.

34. On November 29, 2016, Principal Chin spoke at a Small Learning Community ("SLC") meeting in which Plaintiff was present. Chin stated in sum and substance that "a staff member contacted OSI about the survey, the survey was embargoed… Because of that we lost 30 points." He suggested that this was the reason the school was still classified as a renewal school.

35. On November 30, 2016, Defendant Chin replied-all to a school-wide e-mail directed to Plaintiff. In the e-mail, Defendant Chin stated to Plaintiff: "Your reckless actions will cost people their jobs and affect students and family. If the school goes into independent receivership or closure we are all out of a job." Defendant Chin went on to refer to Plaintiff's earlier actions of publicly e-mailing him on matters of public concern, and asserted that Plaintiff's actions in publicly speaking on matters of public concern constituted "continuous negativity."

36. On or about December 1, 2016, Principal Chin sent a complaint to SCI and alleged that Plaintiff had sent a harassing e-mail to ridicule members of the staff. In fact, the

e-mail described by Defendant Chin as "harassing" was regarding a matter of public concern; specifically, that Defendant Chin could not unilaterally silence employees by removing their access to school-wide e-mail simply because they disagreed with his policy or expressed themselves regarding matters of public concern. Defendant Chin's act of filing a complaint to SCI regarding the e-mail was further retaliation for Plaintiff's actions.

37. On or about December 5, 2016, Plaintiff filed a complaint with SCI alleging retaliation by Defendant Chin towards Plaintiff for whistleblowing. In response, SCI opened an investigation headed by Investigator Robert Carboine and Special Counsel Daniel Schlachet.

38. On or about December 7, 2016, Plaintiff assisted in drafting a letter of complaint to SCI on behalf of five math teachers who alleged that they were being pressured to teach Algebra in classes falsely labeled as Geometry by Dahlia Jones, AP of Math.

39. In apparent retaliation for Plaintiff's complaints and whistleblowing, on December 21, 2016, Plaintiff received the first "Developing" and "Ineffective" evaluations of his career from Defendant Chin based on a December 15, 2016 classroom observation.

40. On or about January 11, 2017, Plaintiff received a troubling e-mail from Terri Wright, Defendant Chin's secretary, suggesting Plaintiff transfer to another school. Specifically, the email stated: "I strongly suggest that maybe you should consider moving on in your career and finding another place to work at that (sic) more suitably fits what you are looking for in an educational institution."

41. On or about January 30, 2017, Principal Chin instructed Ms. Wright to remove Plaintiff's name from regular school wide e-mails and notifications. As a result, Plaintiff did

not receive important school-wide memorandums as well as other important e-mail notifications.

42. On January 30, 2017, after Plaintiff had been removed from the e-mail list, as Plaintiff asked a question at a faculty conference, Assistant Principal Laura Spadacini interrupted Plaintiff and shouted at him to "shut up and sit down!"

43. In response, Plaintiff e-mailed Defendant Chin stating that "[i]t is unacceptable for you as a principal to allow this type of behavior. It is clearly setting up a hostile work environment for me when I was simply asking for clarification about the school's cell phone policy." Defendant Chin did not respond or take any remedial action.

44. On January 30, 2017, after the aforementioned faculty conference, Principal Chin angrily told Plaintiff's close colleague, Susan Kendzierski, that Plaintiff will begin to see a whole "new side" of Defendant Chin.

45. On February 1, 2017, Plaintiff again recounted the above retaliatory incidents to Special Counsel Schlachet in a sworn statement at SCI offices. Also present were Investigator Carboine and UFT attorney Andrew Stoll.

46. On February 8, 2017, Plaintiff learned from another science teacher that one of her students knocked another girl unconscious in a bullying incident in the hallway that led to an emergency room visit. This incident occurred the week prior. After learning of this incident, Plaintiff sent a concerned e-mail to Principal Chin, AP Thomas Carlomusto, and Chancellor Carmen Fariña to ask why the assailant was not given a longer superintendent's suspension instead of a mere five days of in-school detention under a principal's suspension.

47. On or about February 9, 2017, in response to the aforementioned February 8 e-mail, AP Carlomusto told Plaintiff that superintendent's suspensions can only be initiated if

the victim agrees to testify as a witness. When Plaintiff asked if the family was informed of its rights to testify, Carlomusto responded that he did not know and would investigate. Later the same day, AP Carlomusto told Plaintiff that he received an affirmation from Veronica Mackay, the dean who handled the incident, that the family did not want to testify.

48. On or about February 15, 2017, Plaintiff communicated with the mother of the aforementioned bullying victim. Plaintiff learned that FHS deans had not informed the mother that she or her daughter could testify in order to obtain a superintendent's suspension. The mother related that the deans merely told the family that the assailant would be suspended. Plaintiff provided the mother with the telephone number for SCI and suggested that she make a complaint. Shortly after, the mother texted that she had called SCI and obtained a complaint number. Plaintiff informed Defendant Chin that he had spoken to the mother.

49. On February 15, 2017, Plaintiff attended a scheduled Parent Teacher Association (hereinafter "PTA") meeting at FHS. Plaintiff distributed a handout containing the January 2017 Regents Passing Rates for FHS and class passing rates of the various departments, which had been given to teachers at a faculty meeting. AP Patricia Cuti addressed the parents with a presentation about student behavior and academic progress. During the presentation, Plaintiff raised his hand and was allowed the floor. Plaintiff described, without identifying names, the aforementioned bullying incident and informed the parents that the assailant was only given five days of detention.

50. Later, during the same February 15, 2017 PTA meeting, when AP Cuti was speaking about student academic progress, Plaintiff raised his hands and was again allowed to speak. Plaintiff referred to the handout given earlier regarding passing rates and noted that only 10 percent of 210 students passed the January 2017 Living Environment Regents, yet the

9

average percentage of students passing science classes was 62 percent. Plaintiff then remarked that the difference in passing rates had to do with the immense pressure put on teachers by Defendant Chin and his administration to pass students who really did not know the material. He mentioned Principal Chin's practice of assigning teachers who did not pass 75% of their students excessive paperwork duties as punishment. Plaintiff further discussed how he had heard many teachers say that they would just pass students as Defendant Chin wanted because they were afraid of being targeted by the administration. He remarked how the students who failed the Regents Examination, but passed the class, often had trouble graduating.

51. On February 17, 2017, AP Amaya issued Plaintiff another frivolous and unwarranted disciplinary letter concerning the inputting of data on the online grading website, *Skedula*.

52. On March 4, 2017, Plaintiff made an official complaint to UFT Chapter Leader Laura Giglio that AP Amaya had yet to issue him a written observation report regarding an evaluation Mr. Amaya conducted on December 13, 2016. Plaintiff, in his complaint, noted that pursuant to the Collective Bargaining Agreement, Mr. Amaya was required to issue Plaintiff this report within 45 days.

53. As AP Amaya had already sent a preliminary email feedback months before praising Plaintiff, Plaintiff expected that the observation report would be positive. When Plaintiff asked AP Amaya about writing up the observation, AP Amaya suggested that he re-observe Plaintiff. In response, Plaintiff told AP Amaya that he will inform Investigator Carboine about possible collusion with Principal Chin in retaliation for Plaintiff's earlier and ongoing complaints.

54. On March 4, 2017, Plaintiff e-mailed Investigator Carboine about AP Amaya's failure to issue him the aforementioned observation report.

55. On or about March 6, 2017, after repeated requests by Plaintiff, AP Amaya finally issued Plaintiff the observation report for the December 13, 2016 class visit. For the first time in his career, Plaintiff received a rating of "developing" in a sub-component.

56. On March 15, 2017, Defendant Chin issued Plaintiff another unwarranted disciplinary letter concerning the events at the February 15, 2017 PTA meeting. In the letter, Defendant Chin falsely claimed that teachers were not allowed to speak at such functions. Defendant Chin also falsely stated in this letter that Plaintiff rudely interrupted the presentation.

57. On March 30, 2017, Defendant Chin indirectly ridiculed and accused Plaintiff in a school-wide newsletter and e-mail, referring to Plaintiff as insane and delusional.

58. On April 26, 2017, Defendant Chin issued parents and members of the FHS community a letter addressing a New York Post article that alleged misconduct on behalf of Defendant Chin and his assistant principal. In his letter, Defendant Chin stated that "appropriate actions would be taken by the DOE to address these individuals" who made the allegations in the article. Upon information and belief, this memorialized threat by Defendant Chin was directed towards Plaintiff.

59. On May 23, 2017, Defendant Chin issued Plaintiff another unwarranted and baseless less-than-effective written observation report based on a visit to Plaintiff's classroom on April 26, 2017.

60. On June 15, 2017, Plaintiff, along with a math teacher, was summoned by OSI Investigator Jonathon May regarding an investigation initiated by Defendant Chin.

Specifically, Defendant Chin alleged that Plaintiff defamed him in a New York Post article entitled "Principal Allegedly Faked Geometry Classes For Students Who Failed Algebra Exam," published on April 2, 2017.

62. On June 20, 2017, AP Amaya issued Plaintiff a written observation report based on a visit to Plaintiff's classroom on May 26, 2017. Although this class was Plaintiff's highest performing class, with a 90 percent Living Environment Regents Examination passing rate, Plaintiff received numerous unwarranted "Developing" and "Ineffective" ratings on multiple components that were in direct contradiction to what actually occurred during the lesson.

62. On June 22, 2017, Plaintiff received a "Developing" MOTP for the first time in his career.

63. Shortly thereafter, on June 27, 2017, Defendant Chin issued Plaintiff yet another unwarranted disciplinary letter. In the letter, Defendant Chin falsely contended that there were no anecdotal data entries for two particular students who had failed Plaintiff's class. Although Plaintiff pointed out that because these two students had just passed the state regents exam, their class grades would be reversed as allowed, Principal Chin still issued Plaintiff this letter.

64. On or around August 25, 2017, James Desantis, the football coach at FHS, witnessed Defendant Chin accuse Mr. Desantis of conspiring with Plaintiff to destroy his good name. Defendant Chin angrily stated that he would go after Plaintiff and other teachers of FHS and that they were stuck with him.

12

## The 2017-2018 School Year

65. On September 7, 2017, Defendant Chin summoned Plaintiff to his office along with UFT Chapter Leader Laura Giglio and Eileen Coppola, a representative from the Office of School Renewal. The meeting was to discuss the findings of SCI's final report on the investigation against Plaintiff concerning alleged e-mail harassment.

66. On September 13, 2017, Plaintiff emailed Defendant Chin and Superintendent Michael Alcoff his response to the SCI Investigative report, which highlighted its numerous inaccuracies.

67. On September 18, 2017, Defendant Chin issued Plaintiff a disciplinary letter based upon the aforementioned SCI report. Defendant Chin further disallowed Plaintiff's use of the reply-all function and the sending of e-mails to the whole staff with the threat of job termination of employment.

68. On October 11, 2017, Plaintiff was served with New York State Education Law Section 3020-a Disciplinary Charges and Specifications by the NYCDOE seeking termination of his employment. Defendant Chin authorized and signed off on the aforementioned Charges and Specifications.

69. On October 16, 2017, Defendant Chin and a school safety officer escorted Plaintiff out of FHS and directed him for reassignment from FHS to 100 Gold Street in Manhattan.

70. On October 18, 2017, during an SLC meeting, Defendant Chin stated that Plaintiff was the mastermind of a plot to discredit him personally, and warned staff members not to audio tape or report him to SCI. Defendant Chin went on to threaten teachers that they

13

would be charged and removed from the school like Plaintiff if they engaged in similar actions.

71. On October 19, 2017, Defendant Chin was removed as principal of FHS by Superintendent Alcoff and escorted out of the building in the company of a school safety officer.

72. Upon information and belief, Defendant Chin has been reassigned to a reassignment center and is currently awaiting a hearing based on disciplinary charges that have been filed against him.

**FIRST CLAIM FOR RELIEF**
**RETALIATION AGAINST PLAINTIFF FOR EXERCISING FREEDOM OF SPEECH IN VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS**

73. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

74. While acting under color of State Law, Defendants violated Plaintiff's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to matters of public concern.

75. As a proximate result of Defendants' retaliatory actions against Plaintiff, Plaintiff has suffered and continues to suffer monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### RETALIATION IN VIOLATION OF
### NEW YORK STATE CIVIL SERVICE LAW § 75-B

76. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

77. Plaintiff reported violations about federal, state, and city law violations by the school administration, and thereby engaged in a protected activity as defined in New York Civil Service Law § 75-b(2)(a).

78. Defendants had notice that Plaintiff participated in such protected activities.

79. Defendants retaliated against Plaintiff by engaging in adverse "personnel actions" as defined by New York Civil Service Law § 75-b(1)(d).

80. As a proximate result of Defendants' retaliatory actions against Plaintiff, Plaintiff has suffered and continues to suffer a loss of past and future income, monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Intentional and/or Negligent Infliction of Emotional Distress)

81. Plaintiff repeats and realleges each and every allegation contained above, inclusive, with the same force and effect as if more fully set forth herein.

82. Each and every defendant did, without justification, intentionally harm the Plaintiff by playing a part in seeking to wrongfully terminate him from his employment, and some did harm the Plaintiff by damaging his ability to subsequently be hired in any and all districts within the NYCDOE, thereby causing him intentional and/or negligent infliction of emotional distress.

15

83. As a result of the foregoing, Plaintiff did suffer damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Defamation and Libel)

84. While and after Plaintiff was employed by Defendant NYCDOE, Defendants, did, in statements and in writing, with malice aforethought, disseminate about the Plaintiff false personal and professional information, with knowledge of its falsity or with reckless disregard of its falsity.

85. These statements and writings have, in a variety of ways both professional and personal, damaged Plaintiff in the past, the present, and in perpetuity.

86. As a result of the foregoing, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial.

## JURY DEMAND

87. Plaintiff hereby demands a trial by Jury.

## PRAYER/DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor against Defendants as follows:

    a. Judgment declaring that Defendants' acts violated Plaintiff's rights as secured by federal, state and city law prohibiting retaliation in employment;

b. Enjoining defendants from any further acts adversely affecting the terms and conditions of Plaintiff's employment including his compensation and privileges;

c. Compensatory damages to compensate Plaintiff for economic loss, damage to name, profession, career and reputation, pain and suffering, emotional distress and mental anguish, embarrassment, indignity, and dislocation, in an amount to be determined at trial;

d. Punitive damages against one or all of the Defendants;

e. Statutory attorneys' fees, interest, costs, and disbursements, and

f. For such other and further legal, equitable or other relief as the Court deems just and proper.

DATED: New York, New York
January 19, 2018

> GLASS KRAKOWER LLP
> 100 Church Street, Suite 800
> New York, NY 10007
> (212) 537-6859
>
> By: /s: *Bryan D. Glass*
> BRYAN D. GLASS, ESQ.