

ZACHARY W. CARTER
*Corporation Counsel*

T HE  C ITY OF  N EW  Y ORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

JOHN P. GUYETTE
Assistant Corporation Counsel
Phone: (212) 356-2455
Fax: (212) 356-2439
jguyette@law.nyc.gov

October 18, 2018

**By ECF**

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    Ok v. New York City Department of Education, et al.
                18 Civ. 392 (BMC)
                Our No. 2018-005857

Dear Judge Cogan:

        This office represents the defendants in the above-referenced action.  Pursuant to the Court's order, dated October 15, 2018, and all prior orders, please find the attached copy of the 3020-a Opinion and Award in the matter of *Department of Education of the City of New York v. Seung Yong Ok*, SED File No. 32,199.

        Respectfully submitted,

        /s/

        John P. Guyette
        Assistant Corporation Counsel

Cc:    **GLASS KRAKOWER LLP**
       Attorneys for Plaintiff
       100 Church Street, 8th Floor
       New York, NY 10007
       Att: Bryan D. Glass
       (By ECF)

NEW YORK STATE EDUCATION DEPARTMENT
UNIT OF SCHOOL DISTRICT EMPLOYER-EMPLOYEE RELATIONS

_____

| | | |
|---|---|---|
| In the Matter of the Charges Preferred By: | ) | |
| | ) | |
| DEPARTMENT OF EDUCATION OF THE | ) | SED File No.: 32,199 |
| CITY OF NEW YORK, | ) | |
| | ) | Opinion |
| Complainant-Employer | ) | and |
| | ) | Award |
| v. | ) | |
| | ) | |
| SEUNG YONG OK, | ) | |
| Respondent-Tenured Teacher | ) | |
| | ) | |
| Pursuant to Education Law Sections 2590-j and 3020-a_____ | ) | |

Before Donald T. Kinsella, Hearing Officer

Appearances:

> For the Department:
> Howard Friedman, Esq., General Counsel for Department of Education
> By Jessica Kishpaugh, Esq., of Counsel, Office of Legal Services

> For the Respondent:
> Robert Reilly, Jr., Esq., General Counsel NYSUT
> By Harold Eisenstein, Esq. of Counsel, NYSUT

The Department of Education of the City of New York ("Department") brought

disciplinary charges against Seung Yong Ok ("Respondent"), a tenured teacher, on October 10,

2017, pursuant to New York State Education Law §3020-a. The Respondent requested a

hearing. The undersigned was appointed as Hearing Officer in this matter on October 31, 2017.

A Pre-hearing conference was held on April 19, 2018. The hearing was conducted at the

offices of the New York City Department of Education at 100 Gold Street, New York, NY on

June 5, 6, 27, 28, and July 11, 2018. The parties were represented by their respective counsel

throughout the proceedings and were afforded the opportunity to present and examine witnesses,

to cross-examine witnesses, to present documentary evidence, and to present legal arguments.

Closing arguments were heard on July 11, 2018. A stenographic record of the proceedings was made, and upon my receipt of the final volume of the transcript on July 18, 2018, the Record in this matter is closed.

The evidence presented, the authorities cited, and the positions and arguments set forth on behalf of the parties have been fully considered by the undersigned whether or not cited or referred to herein.

Respondent is a tenured teacher who has worked for the DOE for 21 years as of the date of the hearing. During the times relevant to the Specifications in this case, Respondent taught Living Environment (Biology), AP Biology, Health Careers, and Anatomy and Physiology teacher at Flushing High School, Queens, N.Y.

## SPECIFICATIONS

The following are the Combined Specifications filed against the Respondent as contained in Department Exhibit 1 (DOE-1)[1]:

Seung Yong Ok (hereinafter referred to as Respondent), under File #0729278, is a tenured teacher assigned to Flushing High School, located in Queens, within District 25. During the 2015-2016 and 2016-2017 school years, Respondent engaged in misconduct, harassment, insubordination, conduct unbecoming his position and neglect of duty as follows:

In Particular:

SPECIFICATION 1: On or about February 15, 2017, Respondent interrupted a Parents Association meeting in that, Respondent:

a) Gave parents his phone number and/or directed parents to call him for the real status of the school.
b) Accused another faculty member of failing to translate the Respondent's statements at the Parents Association meeting because she did not want to tell the truth to parents.
c) Polled parents regarding whether or not they received "cut calls" from the school if their child was absent from school.
d) Told parents that teachers are being pressured to pass students.
e) Told parents that students are just being pushed through the system.

---

[1] "DOE" refers to Department's Exhibit; "R" refers to Respondent's Exhibit; "T" refers to the page number of the transcript; "J" refers to Joint.

SPECIFICATION 2: During the 2015-2016 and/or 2016-2017 school years, Respondent created and/or attempted to create a hostile work environment in that:

a) Respondent continuously sent e-mails to colleagues who asked to be removed from his distribution list.
b) Respondent repeatedly replied all to e-mails from administration to staff to discuss his personal grievances with the administration.
c) On or about May 2017, Respondent sent an e-mail to the entire staff stating, kudos to those teachers for standing up for what's right even if it means personal risk in a corrupt system.

SPECIFICATION 3: On or about December 1, 2016, Respondent sent an e-mail to the entire staff, which stated in sum and substance:

a) Mr. Amaya - I'm sorry, but I just realized that every time you email me, there seems to be more work I need to do. Plus, I never mentioned this before, I feel harassed by the mention of your achievements in the iron man competition in the email stamp. I always feel bad about myself when I see that you can teach, lead the department, coach, be a father of 4 children, and still manage to have a six pack. And you do realize that I live like 5 houses away from you? Please choose another route for your run if you can. Is it really necessary to wear those tight biking shorts as well? Every time my wife sees you running by, she immediately glares at me with a look I can only describe as accusational, as I sit watching tv with a bag of potato chips.

b) Ms. Pinkasova - Please remove me from your distribution list. My therapist recently told me that my nightmares of being chased by a big W can only be from the daily Witsi inquiries you force us to do. In fact, I have been having flashbacks of sentence fragments and BBS tasks every time I see the color pink during my school day.

c) Ms. Alicanoglu and Ms. Berhumoglu - Please, I do not want any correspondence from either of you because, honestly, your names are so hard to spell that I have to waste valuable time - time I could be spending on my students - to constantly refer back to email lists to see that I spelled your names correctly (I actually had to look twice for this paragraph). Please follow my example : Ok. I would prefer you both not send me any emails until you officially change your names to Al and Ber.

d) Mr. Cervalis - Even though I have never had a mass email from you, I have to ask that you never do. Your mannerism and voice have a frightful resemblance to George Costanza from Seinfeld. Just the mere thought of you (or George) distracts me from the important work of preparing my lesson plans. Remember the time George wanted a better parking spot.. .. damn, I did it again.

e) Mr. Copchains - Please remove me from any future emails. Nothing personal, but with my past actions, your name brings me dread and guilt. Your name actually harasses me. The only thing worse would be if your name was Doctorneedle.

f) Ms. Stevens - It's bad enough that you enter the room after my class with more energy at 8:45 in the morning than the teenagers we teach, but your impeccable dress and accessories puts my 1 10 dollar golf shirts from Modell's to shame. Although you seem to know the ins and outs of grammar and syntax - I can not but be offended that you believe that Alanis Morissette's lyrics in the song , "Ironic" actually shows irony. A black fly in my chardonnay is not ironic. It would only be ironic if that fly lived it's life fighting for the temperance movement.

g) Dr. Chester- no explanation necessary.

h) It is now midnight so I must get back to sewing my Cheerleading outfit. But I promise that there are plenty of more people I would like to bar from sending me any more work related emails.

i) As a suggestion can there be a position posting for Email Block List coordinator? I believe that plenty of other staff members would like to omit emails from others they disagree with at FHS.

SPECIFICATION 4: During the 2015-2016 and/or 2016-2017 school years, the Respondent failed to adhere to the Principal's directive to stop sending the emails as described in Specification 2 and/or Specification 3.

According to the Department, the conduct, if proven, constituted: just cause for discipline under Education Law §3020-a; neglect of duty; conduct unbecoming Respondent's position or conduct prejudicial to the good order, efficiency, or discipline of the service; a violation of the by-laws, rules and regulations of the Chancellor, Department, School and/or District; misconduct; harassment; insubordination; substantial cause that renders Respondent unfit to perform his obligations properly to the service; and just cause for termination.

## DECISION

The evidence presented consisted of the testimony of six witnesses, and the presentation of 18 exhibits by the Department, and the testimony of Respondent Seung Yong Ok and six witnesses, and the presentation of nine exhibits on behalf of Respondent.  The evidence, the authorities cited, and the positions and arguments set forth on behalf of the parties have been fully considered whether or not cited or referred to herein.  Both parties had the full opportunity to present evidence and witnesses, to cross-examine witnesses, to make arguments in favor of

their respective positions, to make opening and closing statements, and to provide legal authorities supporting their positions.

Based on my review of the record, my assessment of the credibility of the witnesses, and my review of the probative value of the exhibits and evidence, I find the Department has met its burden and shown the Respondent to have engaged in conduct unbecoming his position with respect to the allegations in Specifications 2a and 3. The Specifications proven by the Department in this case constitute just cause for disciplinary action under Education Law §3020a. The Department failed to meet its burden with respect to Specifications 1, 2b, 2c, and 4.

As set forth below, I find that the appropriate disciplinary penalty for the violations committed is a fine of $500, continuing education and remedial action as set forth below.

PROOF

Respondent- Seung Yong Ok (T 393-488) is a tenured high school biology teacher. At the time of the conduct alleged in this matter, he had been a Living Environment (Biology), AP Biology, Health Careers, and Anatomy and Physiology teacher at Flushing High School for six or seven years. Prior to that, he taught for 14 years at William H. Maxwell Vocational High School in Brooklyn. Prior to December 2016, Respondent had always been rated as effective to highly effective by his supervisors. For 2015-16 and 2016-17, an average of 80 and 81% of Respondent's students passed the Living Environment Regents exam. The Flushing High Science Department average for the same years was 60 and 50% of students passing.

Flushing High School, in Queens, has 1800-2000 students and 120 teachers. The student body is 36% high needs, 22% ELL (English Language Learners), and 83% are from foreign countries.

The Department's six witnesses, Assistant Principal (AP) Patricia Cuti (T 162-198), AP Tiffany D'Alessio (T 198-221), Special Commission on Investigation Supervising Investigator Andre Jenkins (T 31-99), Flushing High Principal's secretary Terri Wright (T 99-122), teacher Vincent Tobia (T 123-46), and teacher Keith Carvelas (T 233-50) were credible and competent witnesses, except as noted in the decision below.  Each of the DOE employees has sufficient educational degrees, licensure, training and experience as an administrator, classroom teacher, or other professional with the DOE to provide competent testimony.  Respondent's witnesses, teacher Natalie Berhumoglu (T 251-284), former Flushing High teacher Lucienne Shannon Schnell (T 284-300), teacher Javier Gomez (T 301-17), teacher and Flushing High UFT representative Laura Marie Giglio (T 324-63), retired teacher Rita Baris (T 363-78), and former Flushing High teacher Christopher DeNigris (T 378-92) provided relevant information with respect to the Specifications.  Respondent (T 393-488) provided some context to the events surrounding the Specifications and explained his actions.

The conduct alleged in the Specifications is descriptive and in a sense is undisputed. Respondent and his fellow staffers occasionally received emails addressed to all of the staff in the school concerning various school and education related issues.  Respondent would frequently use the "reply all" button in his email to respond to the Principal.  Usually Respondent was on topic in his responses, but occasionally he would add other issues to his response – the issues raised by the Respondent were always education or school related, except, arguably, the reply email described in Specification 3.  A few employees asked Respondent to remove their names from his distribution list.  Respondent informed the employees that it was not his list, he was just using reply all, and he would occasionally encourage the complaining party to ask someone at DOE about his practices.  On a few occasions, the Principal would reply to Respondent's email

directly without copying the rest of the staff.  The Respondent would somehow then reply to the Principal's reply by again including the full list of recipients from the first email.  No one asked him how he did this, since he testified that his only distribution list was for 20 people in a pizza/lunch group; presumably he copied the recipient list from the original email and pasted it into the "to" field of his reply.

Andre Jenkins (T 31-99), Supervising Investigator, Special Commission of Investigation (SCI) supervises a team of ten investigators, and he has been with the agency since 1990.  Before that he was an investigator with the Inspector General's Office of the Board of Education.  The SCI investigates employee misconduct  relating to criminal activity, conflict of interest, and fraudulent use of documents.  Mr. Jenkins has extensive experience in his role.  In early December 2016 an investigator working for Mr. Jenkins was assigned to investigate a complaint against the Respondent.  DOE Exhibits 2A-2I were identified as the case file relating to Respondent.  The assigned investigator had conducted a number of interviews, and he had obtained a large number of documents and emails.

DOE 2A was a letter from the SCI Deputy Commissioner recommending strong disciplinary action against Respondent, including dismissal from employment, or at least a warning that continuation of Respondent's conduct would result in termination, and a recommendation that the DOE computer technology people do something to restrict the Respondent from using the "Reply All" function on his DOE email account.

The initial complaint that triggered a file being opened on Respondent in early December 2016 was followed in quick succession by a number of similar complaints about his email usage and "bullying".  (DOE 2B) The case was briefly referred to the NYPD, but within a matter of days was sent back to SCI for an investigation.  The investigative steps and a synopsis of

interviews are set forth in a series of action reports that form the bulk of DOE Exhibit 2C.  The first ten pages of DOE 2C are a final report from the assigned investigator.  The investigators' notes are incorporated in DOE 2D.  DOE 2E contained a worksheet, investigative checklist, a list of all of the documents (in groups) related to the investigation contained in DOE 2E, and in subsequent DOE Exhibits DOE 2F-I.

Mr. Jenkins accompanied the investigator to an interview of Respondent.  Mr. Ok indicated that he felt that there was no policy against doing a reply all to emails from administration and staff; during the interview, Respondent indicated that he would stop including people who had expressed discomfort or objection to inclusion in the reply all emails.  Jenkins also reviewed the email that formed the basis for Specification3; he did not find the email as amusing as Respondent thought it was.

On cross examination, Sup. Inv. Jenkins acknowledged that the investigative file did contain documents related to an Office of Special Investigations inquiry in 2013 that concluded that Respondent was not violating Departmental regs or the law when he hit reply all to all Departmental emails, filling his fellow employees' mailboxes with Respondent's views on many topics.  The Flushing High Principal at the time was going to take care of the situation some other way.  (DOE 2E Bates pp. 188-207) Mr. Jenkins also admitted that a complaint of creating a toxic work environment by replying to all emails with critical comments about the administration of the school did not violate Chancellor's Regulation A-830 relating to discrimination.

Patricia Cuti (T 162-198) Assistant Principal (AP) Flushing High School Pupil Personnel Services (attendance and programming guidance) has been in her position for seven years after working as a Guidance Counselor for three years.  She knew Respondent to be a biology, or living environment, teacher to 9th through 12th Grade students.  The AP had a cordial relationship

with Respondent, but she became concerned about his group emails to staff at the school.  She

described the situation as follows:

> The e-mails had escalated over a period of time. They had gone from professional
> e-mails to e-mails that were more personal in nature. They started to single out
> individuals in Flushing High School….(I)t made me feel very uncomfortable. I
> was worried and concerned about responding to the e-mails, that I was not
> involved in in terms of the content matter. It did not pertain to my position or my
> job at all. People that were asking to be removed from these e-mails were
> personally singled out, and it made me feel concerned, worried.
>
> … At first, they talked about pedagogical concerns. They were discussing
> curriculum or strategies, or passing rates and questions. When they progressed on
> and they became more frequent, they were directly addressed to the principal.
> They were directly addressed to his supervisor. In some of the final e-mails that
> we started receiving they talked about people's attire, they talked about people's
> physique, and they talked about their names, their mannerisms, their personal
> behaviors. (T 166-8)

AP Cuti felt that Respondent's concerns about school matters would have been better

addressed at a faculty meeting, in a departmental meeting, or with supervisors – not with a large

number of people who were not necessarily involved in the issues raised by Respondent, such as

the school aides, secretaries, guidance counselors, etc. who were included in the group emails.

AP Cutie was afraid that she would be targeted if she asked Respondent to stop.  Several

Guidance Counselors expressed to her that they were concerned about being recipients to

Respondent's emails.  It should be noted that there was no evidence of any personal emails as

described by AP Cutie, except the December 1, 2016 email described in Specification 3.

AP Cutie identified the portions of the staff handbooks for 2015-16 (DOE 3) and 2016-17

(DOE 4) that related to internet usage.  The DOE usage policy stated that the access to or use of

the internet through DOE connections should be solely for educational purposes.  It defined

"acceptable" e-mail use as "…(T)hose that conform to the purpose, goals, and mission of the

DOE and to each user's job duties and responsibilities."  "Unacceptable" use was defined as:

"…(A)ctivities using DOE hardware, software, or networks at any time that does not conform to the purposes, goals, and mission of the DOE and to each user's job duties and responsibilities."

The AP was also involved in a parents' association meeting on February 15, 2017. The meeting was to be run by Zelma Vasquez, the PTA President, and was to last about an hour. AP Cutie was to use about 35 minutes to discuss initiatives at Flushing High, parental updates, college and career readiness issues, and attendance. Respondent was present for the meeting, but was not on the agenda. AP Cutie, who had attended every monthly PTA meeting for seven years had never seen Respondent at one before. Respondent distributed fliers to parents at the meeting. The fliers concerned Regents exam results and data, including passing percentages; the fliers also listed Respondent's personal phone number.

During the meeting, and after AP Cutie had given a presentation on the respect for all initiative at the school. Respondent got up and began talking about an incident in which a student was punched, and he mentioned that the guilty party received only mild discipline. The PTA President tried to tell Respondent that there was an agenda and that he could bring issues up at the end of the meeting, if there was time. Respondent continued on the topic despite the President's request. He then got into a dispute with an administrator who was handling English Spanish translation duties – she had stopped translating because one of the parents of one of the students involved in the incident was at the meeting. Respondent kept talking anyways. AP Cutie tried to continue her presentation with a discussion of attendance, and Respondent interrupted and began asking questions and making pronouncements about attendance issues, Regents passing rates and his own performance evaluations. He finally stopped talking about half way through the meeting.[2] AP Cutie felt that Respondent's conduct in talking over others

---

[2] Respondent, unbeknown to anyone else at the meeting, recorded it. R 8 is a digital version of the recording, and R 9 is Respondent's transcript of the meeting.

and persistence in talking about his personal views and issues was unprofessional and in the wrong forum.  AP Cutie identified the disciplinary letters given to Respondent with respect to the PTA meeting performance (DOE 5) and Respondent's email usage (DOE 6).

Tiffany D'Alessio (T 198-221) Flushing High School Assistant Principal of Instructional Support Services (ISS), or Special Education came to Flushing High School at the beginning of the 2016-17 school year.  She was a 13-year employee of DOE, working in a variety of positions in other schools before coming to Flushing.  AP D'Alessio was not Respondent's rating officer or supervisor.  Her focus was on special education students, and her responsibilities did not intersect with Respondent's work as a science teacher.  Respondent included the AP in his emails and responses, but she felt that his emails were not related to teaching ISS students.  The AP asked Respondent at least twice to remove her from his emails.  Respondent told her to look up DOE email policies, and that because, in his view, he was not violating them, he would not take her off the list.  The AP also co-taught a class with Mr. Carvelas, one of the targets of Respondent's email directed at individual teachers, as described in Specification 3.  Mr. Carvelas was upset that Respondent had taken to calling him Mr. D'Alessio and for having gone over to the dark side by working with one of the administrators.

Ms. D'Alessio also recounted Respondent's performance at a town hall meeting early in the 2016-17 school year that was supposed to be about how the school was doing meeting its renewal school benchmarks.  Respondent repeatedly interrupted the meeting and accused the Principal of asking teachers to change grades.

Terri Wright (T 99-122), the Principal's Secretary Flushing High School testified that she had worked for DOE for 23 years in various administrative support capacities.  She has been the Principal's secretary for three or four years.  Ms. Wright described Flushing High as "renewal"

school, a struggling school that is under NYS review of its meeting of certain benchmarks.  The

school has approximately 1800 students and 808-100 teachers.  The witness knows Respondent

as one of the teachers at the school.  Ms. Wright became a complainant to SCI on her behalf and

at the behest of the school's Principal (P), Dr. Chin.  She described the situation as follows:

> Q. What, if anything, about the email interaction prompted you to report that to
> SCI?
> A. It was excessive, very negative, very angry. It was mass emails to all staff,
> despite the fact that staff members, including myself, requested that he discontinue
> the use of the email system in this regard, stop emailing me personally. He would
> not and always comes back with a very smart negative remark about it; such as, if
> you don't like it, just don't read it.
> Q. How often would you receive these types of emails from Mr. Ok?
> A. It's excessive; two, three times a week and they were very, very lengthy
> emails.
> Q. Approximately how long, like the duration of how long you were receiving
> those emails.
> A. At least once a week maybe or a little more.
> Q. I'll rephrase my question.
> A. Yes.
> Q. Approximately when did Mr. Ok start sending these types of emails?
> A. As far as I've been in the school I can remember him being notorious for these
> kinds of emails.
> Q. Did the content or tone and/or the amount of emails change at all over that
> time period?
> A. I think they became lengthier and they became more aggressive, more
> demeaning until it eventually started to get personal.
> Q. What do you mean by that?
> A. Well, the last email specifically named particular people, degrading them, went
> into their personal life and even the way their names were spelled. I personally
> refrained from getting too--I personally refrained from trying to email him certain
> times because I was afraid he would get personal with  me or embarrass me.  (T
> 102-3)

Ms. Wright felt that Respondent was wound too tight.  She asked him to take her off the

reply list at least four times.  His answer was always to tell her to delete his reply.  She felt the

tone of Respondent's reply all emails was aggressive and scary.  Eventually the witness took

Respondent off emails so that he could not hit reply all.  She also clearly felt that Respondent

could become unhinged at any time and could hurt someone.

Vincent Tobia (T 123-146) teacher-Career and Technical Education (CTE) Coordinator Flushing High School runs the CTE and work-based learning programs at Flushing High. Recalls Respondent began sending mass emails about the time there was a discussion about grading policies at the school.  After that, Respondent would take opportunities to send mass emails to everyone about various opinions he held.  Mr. Tobia emailed Respondent at least twice, and asked to be taken off the list; he also discussed his desire to be off the list once or twice when he encountered Respondent in the hallways of the school.  One time, Respondent replied by telling Mr. Tobia to check the DOE's email usage policies.  Mr. Tobia liked to arrive at the school early and get to work right away.  He did not want to find his electronic mailbox full of messages about how bad everything was.  Respondent's emails would stir up and cause trouble with other staff members – they were distracting to the real tasks at hand.  The newer version of the email system does not allow users to block other DOE users, so there was no remedy.  Mr. Tobia indicated that Respondent was really bothering him and other teachers:

> bothering is harassment. I didn't feel threatened. I didn't feel like he was being--
> he's going to come after me in any way, shape or form. I felt like, to best describe
> it, when you have that fruit fly buzzing around your head, and you're like come
> on, I've got to do work.  I need to focus. That's what it was. I feel a little anxiety
> now talking about it. Even now, it's like when can this just please stop. I have a
> job to do and it's educating kids.  (T 146)

Mr. Tobia felt that Respondent was always disrespectful to P Chin.  He recalled a faculty meeting during which Respondent engaged in an argument with the Principal for so long that Mr. Tobia went to the rest room to avoid having to listen – he had to go again after he went back to the meeting and found that Respondent and the Principal were still arguing.

Keith Carvelas (T 233-250) an earth science teacher at Veritas Academy has been a DOE employee for 13 years;  11 of those years were at Flushing H.S.  Mr. Carvelas generally got along with the Respondent, but he was not particularly close to him.  The witness was the

recipient of many of Respondent's mass emails, that also included the Chancellor and Superintendent.  Mr. Carvelas read some, read parts of some, and deleted some – depending on the amount of time he had.  He was not particularly annoyed by them, but he did think that some were detrimental to the school.

Mr. Carvelas was one of the targets of Respondent's reply all email described in Specification 3.  At the hearing, he professed not to be bothered by what Respondent said about him; he did say that the email was inappropriate.  His testimony about Respondent's alleged antics and the way he felt was substantially different from the views he expressed in an email he sent to P Chin and AP Amaya in May 2017 (DOE 2E, Bates pp. 093-094) which detailed his frustrations with Respondent, including calling Mr. Carvelas "Mr.D'Alessio".

Natalie Berhumoglu (T 251-284) Flushing High School English teacher has taught at Flushing High for eight years.  The witness did not work with Respondent directly, but apparently admired his style from afar.  She viewed his emails as akin to a faculty member standing up at a faculty meeting to express school-related concerns.  Although she did note that there was a time allotted for this at a meeting, she apparently felt that email allowed a faculty member to discuss any school related issue with everyone on the staff of the school whenever he or she felt like it.  The witness also identified a petition that she and some of the other teachers signed in support of Respondent after these Specifications were filed.  (R 4) Although she was one of the faculty singled out in the Specification 3 email, she took no offense, and felt that the email was merely sent to point out that people could be targeted for anything if someone wanted to use emails in an extreme fashion; in other words, if you are annoyed by someone's emails, it is your problem.

Lucienne Shannon Schnell (T 284-300) a former Earth Science teacher at Flushing High School testified that she had taught Earth Science at the school for 15 years but was recently excessed.  Her daughter babysits for Mr. Carvelas.  The witness viewed the Specification 3 email as a joke, and she thought Mr. Carvelas took it the same way.  This witness also signed the petition for the Respondent.

Javier Gomez (T 301-17) has taught mathematics, calculus, and AP calculus at Flushing High School for 22½ years .  Mr. Gomez signed the petition in support of Respondent and talked with Respondent about grading and curriculum issues in the Mathematics Department.

Laura Marie Giglio (T 324-63) is a 21 year Flushing High School history teacher and is the UFT chapter leader for the school.  At the outset of her testimony, she attempted to correct a peripheral issue from the discipline letter (DOE 5) given to Respondent in connection with the PTA meeting incident.  The witness testified that she advised Respondent that she was getting the UFT District representative involved because she was too new to deal with Respondent's complicated problems dealing with email usage.

Ms. Giglio expressed her view that Respondent had been advised by P Chin that Respondent could send emails to the entire school community if there was an issue that was relevant to the entire group.  (R 6)

When Ms. Giglio saw the email described in Specification 3, she realized it was an attempt at humor by Respondent.  Even though she thought it was humorous, she took it upon herself to talk with all but one of the people mentioned in the email the same day; she spoke with one person the next day.  The teachers and administrators all allegedly told her that they thought it was humorous, or they did not bother reading anything Respondent sent.

Rita Baris (T 363-78) is a retired teacher who taught at Flushing High for a significant part of her 31-year teaching career.  Ms. Baris started her career at Flushing in 1984 and left in 1990; she finished her career at the same school, working there from 2010 until she retired in January 2017.  She was a Master Teacher – when initiatives were introduced at the school, it was her job to break the initiatives down and give professional development, or training, to the teachers.  Respondent was part of the SLC (small learning community) that Ms. Baris was in charge of.  Respondent was an enthusiastic participant in a program designed to teach writing skills in all subject areas.  The witness would often use Respondent's work, and his students' work as examples for other teachers and students.

Ms. Baris spoke with AP Amaya about the email described in Specification 3 as he was mentioned in the email.  AP Amaya was concerned that the email would hurt Respondent's position in the school.  The AP also expressed unhappiness that his personal life outside of school had been described in the email.

Christopher DeNigris (T 378-92) is a special education social studies teacher who taught at Flushing High for 3 years in total.  He was a probationary teacher while he was at the school.  The witness thought a lot of Respondent, and he considered the Specification3 email to be a joke.

Respondent began his practice of using reply all emails in 2013 when the previous Principal instituted a policy of giving a student a grade of 55 for a marking period if the student came to class one day.  This meant, according to the Respondent, that a student could pass the course by merely doing enough work in one marking period to get a decent grade, which would be averaged with the 55s for the marking periods when nothing was done.  Respondent pointed out that DOE policy was to give grades of 0-100, and that this was violative of the policy.

Respondent cc'd the Chancellor at the time and went back and forth by email with officials about this policy.

Respondent, during 2013, called the internet usage office of DOE and asked whether he could send emails about union matters or school related issues in schoolwide emails. The only advice he received was to remember that the emails would be FOIL'able. In the discovery in this case, Respondent learned that teachers and the Principal had complained to both SCI and OSI in 2013 about Respondent's use of reply all in his school related emails. The OSI determined that there was no violation of Chancellor's Regulations. (DOE 2E, Bates pp. 188-211). Principal Brown was Principal when the 2013-14 school year complaint was made to OSI. A new Principal, Ms. Radavich, took over in 2014-15, but the reply all emails stopped because there were no initiatives that, in Respondent's view, violated other laws or policies. Mr. Kendall was the next Principal. There were no problems with emails with him because everyone supported one of Respondent's reply all initiative over an unfair comparison between Flushing and another high school. Mr. Kendall did tell Respondent that reply all had the potential to promote a negative school culture – Respondent claimed to reply to that suggestion by asking what the difference was between hitting reply all and getting up at a faculty meeting.

Finally, Principal Chin arrived. P Chin arrived in 2015-16 and was removed from the school about the time that Respondent was removed in October 2017. Trouble with P Chin over emails began in December 2015; there was an email exchange between Respondent and the Principal that included the entire staff as recipients. (R 6) Respondent was advised that he could continue to send emails to the entire staff, Respondent was within his rights to do so; but, P Chin advised Respondent that if he had a question for the Principal, he should address the Principal without adding others to the email chain. Respondent claimed that he was not advised by

Principal Chin that he should not use reply all until the September 18, 2017 disciplinary letter. (DOE 6)  Respondent claimed that the last time he used the reply all function was on April 29, 2017, four months before the disciplinary letter.

Respondent also recounted the PTA meeting incident on February 15, 2017.  Respondent went because he was concerned about an assault that had taken place in the school, and the low percentage of passing grades in the January 2017 Regents biology exam.  Unbeknownst to anyone at the meeting, Respondent recorded the proceedings.  (R 8)  A transcript was prepared as well.  (R 9)  Respondent received a disciplinary letter regarding the PTA meeting incident (DOE 5), and he did not attend any more PTA meetings.

Respondent claimed that all of his emails referred to in Specification2 were reply all emails to messages that dealt with school and educational issues.  Respondent did not have a distribution list, and he advised people who wanted to be taken off his email replies that the original list of recipients was not his list, and that they should delete the messages.  For the final email in April 2017, Respondent claimed that he did remove four persons' names from the list of recipients that had come with the original email.

While at the school, Respondent complained to SCI and OSI a couple of times himself. One complaint that alleged that P Chin had directed the teachers to put only positive responses on the teacher survey for 2015-16 was investigated by OSI in the Spring of 2016.  The OSI investigator allegedly told Respondent that the complaint about the 75% pass quota was being investigated by SCI.  P Chin told the staff in 2016-17 that a "whistleblower" had caused the school to lose points that would have gotten the school out of renewal status.  Because the loss of points was related to the teacher survey, some teachers and staff thought that Respondent had been the whistleblower, and they reacted negatively towards him.

Respondent also attempted to explain his view of what happened with respect to the email set forth in Specification 3.  Respondent (and the rest of the staff) received an email from P Chin accusing Respondent of being negative and pulling apart the school.  The Principal also advised Respondent (and the rest of the staff) that Respondent's actions "(W)ill cost people their jobs…." (DOE 2E, Bates pp. 273-4).  The email urged Respondent to become a cheerleader, and asked Respondent to remove him (the Principal) from the email distribution list.[3]  Respondent replied (to all, including the Principal) with the email that became Specification 3.  (DOE 2E, Bates pp.270-3) Respondent testified that he attempted a humorous response, but that he now realizes that humor can be a "tricky thing" if it is misconstrued.  He indicated that he would not do something like this again.

Respondent also noted that he had been shouted down four times in faculty meetings when he tried to address pedagogical issues.  Two times by an AP and two times by an athletic coach.  One of the coach shout down incidents was referred to by P Chin in the November 30 email noted above – P Chin said that he agreed with the coach.  The only negative comment about the Specification 3 email was from Mr. Carvelas, who said that P Chin had given him a bad observation, and Respondent was going to get them all fired.  P Chin was removed from the school at about the same time as Respondent in October 2017.  Respondent wishes to return to teaching high school sciences.

Although the Department and Respondent did produce witnesses who were recipients of emails or observed the events described in the Specifications, both parties did rely on hearsay evidence in order to attempt to prove or counter the allegations in the Specifications.  While hearsay is admissible in a proceeding such as this, the proffered hearsay must be analyzed as to

---

[3] This would have been an interesting achievement as the Principal was the sender of the emails that Respondent was hitting reply all to.

its reliability and weight as due process in our system generally allows a party to directly

challenge witnesses who offer adverse proof.  Reliability of hearsay can be evaluated by looking

at the character and type of the declarant, the availability of the declarant to testify, the

declarant's basis of knowledge, bias, relationship to the litigants, details of the statement,

corroboration, and the degree of relevancy to the case.  In this case the hearsay was appropriately

admitted.  However, in that vein, it must be noted that the former P Chin did not testify at the

proceeding.  No reason for the failure to call him was proffered, although Respondent testified

that he and P Chin were in the same re-assignment center.  Again, all of the proffered hearsay

will be considered as authorized by law, but it's weight and probative value will be generally

diminished by the lack of showing of unavailability, and the interest and bias of the declarants.

     The Department of Education provides its "Internet Acceptable Use Policy" on its

website.  The relevant portions are as follows:

> Internet access and e-mail provided by the Department are intended for
> educational use, instruction, research and the facilitation of communication,
> collaboration, and other Department related purposes. Users are subject to the
> same standards expected in a classroom and/or professional workplace….

> Users may not engage in any of the activities prohibited by this policy when using
> or accessing the Department's Internet Systems.  If users are uncertain whether
> behavior is prohibited, they should contact a teacher, supervisor or other
> appropriate Department personnel. The Department reserves the right to take
> immediate action regarding activities that (1) create security and/or safety issues
> for the Department, students,  employees, schools, network or computer
> resources, or (2) expend Department resources on content the Department
> determines lacks legitimate educational or Department content or purpose, or (3)
> the Department determines are inappropriate….

> Below is a non-exhaustive list of examples of prohibited behavior:

> 1. Causing harm to others, damage to their property or Department property,
> such as:…

- Using, posting or distributing profane, lewd, vulgar, threatening, or abusive language in e-mail messages, material posted on Department web pages, or professional social media sites;…

- Accessing, posting or distributing harassing, discriminatory, inflammatory, or hateful material, or making damaging or false statements about others;…

- Sending, posting, or otherwise distributing chain letters or engaging in spamming;…

- Using the Department's Internet System in a manner that interferes with the education of the user or others or the job duties of the user or others….

## POSITIONS OF THE PARTIES

Respondent takes the position that DOE failed to meet its burden of proving any of the Specifications by a preponderance of the evidence, and even if one or more Specifications were proved, Termination would not be an appropriate penalty.  According to counsel, Respondent was responsibly executing his 1st amendment free speech rights by discussing matters that were important to education, the students, and Flushing High School.

In his closing argument, Respondent's counsel stated:

Rita Baris, master teacher, "She also stated that his ideas on writing and how students learn to write were used throughout the entire school, and she added that his lesson plans were also exemplary and used throughout all the school's Departments. His ideas on increasing parental engagement were also accepted and used throughout the school.  She also noted in her testimony that Mr. Ok routinely stayed after school. He volunteered to do that work with the students at no compensation, and she specifically stated on cross-examination that he did not create a hostile work environment in neither the Department or the school. There was never any mention on cross of harassment by Mr. Ok of any other teachers." that Mr. Amaya, the head of the Science Department, did not appreciate the e-mail, but was more concerned for Mr. Ok's continued employment with the school. She noted that Mr. Amaya appreciated Mr. Ok's work ethic, his ideas for advancing his students' abilities, and his constantly bringing in outside materials--like, for example, pond water--to his class in order to help his students grasp the lesson. In addition, …take note that in Mr. Ok's entire teaching career of 20 plus years he has always wanted to teach students from poor neighborhoods, immigrants who speak English as a second language. Further, this is Mr. Ok's first 3020- a charges, and his evaluations prior to Principal Chin at Flushing high

School were either highly effective or effective, and his students have always
done well on the science Regents, in fact, much higher than the averages than the
other teachers in the Science Department....

The Department takes the position that it did prove that Respondent committed all of the

acts outlined in the Specifications.  The Department felt that Respondent had basically lost

control and imposed his thoughts and ideas inappropriately and annoyingly on the rest of the

school's staff and administrators.  Counsel argued that other teachers had been asked to be

removed from emails since 2013.  In 2014 Respondent was warned by P Kendall.  P Chin

warned Respondent to remove names of people who had asked out from his list.  When people

asked off the list, Respondent sent them curt responses.  DOE's counsel stated:

> I'd like to talk about the internet acceptable use and safety policies, which state
> that the Internet access and e-mail provided by the Department are intended for
> educational use, instruction, research, and the facilitation of communication,
> collaboration, and other Department related purposes. Users are subject to the
> same standards expected in a classroom and/or professional workplace. The
> Department reserves the right to take immediate action regarding activities that
> the Department determines are inappropriate. It does list a non-exhaustive list of
> prohibited behavior, and some examples are on point in this case, such as
> distributing, harassing, inflammatory, or hateful material, making damaging or
> false statements about others, engaging in spamming, using the Department's
> Internet systems in a manner that interferes with the education of the user or
> others, or the job duties or the user or others.

> The handbook, both of them that were put into evidence, further clarifies the
> acceptable uses of e-mail and refers to the Department's Internet acceptable use
> and safety policies. The handbook clarifies that acceptable e-mail activities are
> those that conform to the purpose, goals, and mission of the Department.
> Unacceptable use does not conform to the purpose, goals, and missions of the
> Department, including transmitting offensive, harassing information and
> distributing junk mail. Moreover, the handbook notes that users may be subject to
> limitations on their use of e-mail as determined by their supervisor.

Counsel for the Department pointed out that the SCI had recommended strong

disciplinary action that might include termination.  Counsel advocated that the appropriate

penalty for Respondent would be termination.

FINDINGS

I address the Specifications in the order they appear in the charging document, DOE 1  The

Specifications do not necessarily stand out themselves as any kind of misconduct; the preamble

to the Specifications provides the context for what is alleged to be wrong.  The preamble states

that "During the 2015-2016 and 2016-2017 school years, Respondent engaged in misconduct,

harassment, insubordination, conduct unbecoming his position and neglect of duty as follows:"

SPECIFICATION 1: On or about February 15, 2017, Respondent interrupted a Parents
Association meeting in that, Respondent:

a) Gave parents his phone number and/or directed parents to call him for the real status of the
school.
b) Accused another faculty member of failing to translate the Respondent's statements at the
Parents Association meeting because she did not want to tell the truth to parents.
c) Polled parents regarding whether or not they received "cut calls" from the school if their child
was absent from school.
d) Told parents that teachers are being pressured to pass students.
e) Told parents that students are just being pushed through the system.

Both sides offered proof about what occurred at this meeting.  The most significant proof

was the recording of the meeting by the Respondent.  (R 8) Whether it was appropriate to do this,

is not an issue in this case.  The recording reveals that AP Cutie was acting in an appropriate,

polite, and professional manner at the meeting.  She was polite to the Respondent who spoke at a

few points in the meeting.  Respondent was also polite and respectful with his comments, which

were all about issues that would concern parents of students in the school.  Respondent did not

say the things attributed to him in Specification 1b.  Respondent asked the AP doing the

translating why she had stopped, and he was told that it was because one of the parents of one of

the students involved in the assault incident was in the room.  There was nothing about not

wanting to tell the truth.  Nor did Respondent ever direct parents to call him for the "real" status

of the school.  He gave the parents his phone number and advised them to call him if they wanted

to.  The phone number and translation issues related to an agenda item about bullying, and

Respondent raised issues about an assault incident and a near riot incident in the school.  When

AP Cutie spoke about attendance issues, Respondent raised the issue of cut calls home.  When

AP Cutie spoke about the importance of graduation, Respondent raised the issue of the

difficulties students have re-taking Regents exams (necessary for graduation) without being able

to re-take a course that they had "passed" under the marking system.

Respondent's comments were appropriate to the meeting agenda and related to the

educational business of the school.  The comments were not disruptive; the meeting finished

sooner than planned.  The PTA President controlled the agenda and AP Cutie was polite and

informative to the attendees and to the Respondent.  Respondent did not go back to another

meeting after receiving a disciplinary letter.

The Department did not prove by a preponderance of the evidence that Respondent's

actions in the meeting described in Specification 1 amounted to misconduct in any form.

SPECIFICATION 2: During the 2015-2016 and/or 2016-2017 school years, Respondent created
and/or attempted to create a hostile work environment in that:

a) Respondent continuously sent e-mails to colleagues who asked to be removed from his
distribution list.
b) Respondent repeatedly replied all to e-mails from administration to staff to discuss his
personal grievances with the administration.
c) On or about May 2017, Respondent sent an e-mail to the entire staff stating, kudos to those
teachers for standing up for what's right even if it means personal risk in a corrupt system.

The Department relied on the testimony of all of its witnesses and almost all of its

exhibits to prove these Specifications.  It is clear that Respondent continuously sent emails,

almost always in a "reply all" form to colleagues who had received the original email.  The

people who received Respondent's replies also received the original email.  In essence, the

recipients were chosen by the Principals who sent the emails originally.  Respondent merely used

reply all rather than reply.  The Principals continuously acknowledged (as did OSI in 2013) that Respondent could use reply all so long as he discussed issues related to education, which would presumably be the purpose of the Principal's original email.

Respondent drove a truck through that opening.  Some of the people on the distribution list did not want to hear from the Respondent.  His reply emails were almost always critical of some aspect of the situation at Flushing High.  Some people get tired of constant reminders about problems that they have nothing to do with, and which they cannot fix.  Respondent was adept enough with the system to include the original recipients in some of his reply emails when an administrator had replied to one of Respondent's replies without using reply all.  It would be a simple matter of courtesy to take people off the email chain who did not want to be part of the discussion Respondent wanted to have.

Respondent's personal grievances were not a major part of his email replies.  Just because he felt strongly about some issues related to integrity and focus on improving student outcomes does not mean that those things are personal grievances.  The content of the emails was related to educational issues.

That having been said, Administrators have the right to run orderly discussions, just like they can run orderly meetings.  Being a whistleblower, or exercising 1st Amendment rights, does not allow a teacher to disrupt meetings with administrators by taking over the agenda and doing all the talking – even if the talking is about the subject matter of the meeting.  If someone sends an email and invites a group discussion, presumably replies from members of the group are appropriate and wanted.  Where there is no reply necessarily invited, it should be easy to see that some people may not be interested in reading a reply.

Respondent knew that some people did not want to hear from him long before any warning from investigators or discipline letters.  Common courtesy would seem to require that he delete names from the "to" box on his email when three or four people have asked him to.

The Department showed by a preponderance of evidence that Respondent continually sent emails to colleagues who did not want to hear from him as alleged in Specification 2a..  He surely knew that the persistence of his doing so made it annoying to someone to have to bother to delete the email without reading it.  This was annoying and was conduct unbecoming his position, as alleged.  It was not misconduct, insubordination, harassment, or neglect of duty.

The Department failed to show by a preponderance of the evidence that Respondent repeatedly used reply all to discuss personal grievances.  Respondent did occasionally mention his view that his lesson observation ratings were lower as a result of his raising issues about the operation of the school.  Respondent may have held persistent views about grade inflation, manipulation of surveys, etc., but that does not mean that they are personal grievances.

Specification 2c. came from email on May 8, 2017.  This email was part of a string of emails (DOE 2E, Bates pp. 96-101) that started with a group email to the staff about events in May 2017, including the fact that it was teacher appreciation week.  Another staff or faculty member then hit reply all and sent an email thanking the administration for recognizing teachers that day and for the school doing well on its quality review.  Respondent then responded by "piggy backing" on the other staffer's comment and expressed appreciation for teachers who battle for children as if they are their own children, and for teachers who stand up for what is right.  Respondent then topped that comment off by providing a link to an article about a Principal who had turned around another failing school and noting that Principal's courage.  He did say the words mentioned in the specification, but the Department failed to prove by a

preponderance of the evidence that there was misconduct with respect to this particular email.

Specification 2c should be dismissed.

SPECIFICATION 3: On or about December 1, 2016, Respondent sent an e-mail to the entire staff, which stated in sum and substance:

a) Mr. Amaya - I'm sorry, but I just realized that every time you email me, there seems to be more work I need to do. Plus, I never mentioned this before, I feel harassed by the mention of your achievements in the iron man competition in the email stamp. I always feel bad about myself when I see that you can teach, lead the department, coach, be a father of 4 children, and still manage to have a six pack. And you do realize that I live like 5 houses away from you? Please choose another route for your run if you can. Is it really necessary to wear those tight biking shorts as well? Every time my wife sees you running by, she immediately glares at me with a look I can only describe as accusational, as I sit watching tv with a bag of potato chips.

b) Ms. Pinkasova - Please remove me from your distribution list. My therapist recently told me that my nightmares of being chased by a big W can only be from the daily Witsi inquiries you force us to do. In fact, I have been having flashbacks of sentence fragments and BBS tasks every time I see the color pink during my school day.

c) Ms. Alicanoglu and Ms. Berhumoglu - Please, I do not want any correspondence from either of you because, honestly, your names are so hard to spell that I have to waste valuable time - time I could be spending on my students - to constantly refer back to email lists to see that I spelled your names correctly (I actually had to look twice for this paragraph). Please follow my example : Ok. I would prefer you both not send me any emails until you officially change your names to Al and Ber.

d) Mr. Carvelas - Even though I have never had a mass email from you, I have to ask that you never do. Your mannerism and voice have a frightful resemblance to George Costanza from Seinfeld. Just the mere thought of you (or George) distracts me from the important work of preparing my lesson plans. Remember the time George wanted a better parking spot.. .. damn, I did it again.

e) Mr. Copchains - Please remove me from any future emails. Nothing personal, but with my past actions, your name brings me dread and guilt. Your name actually harasses me. The only thing worse would be if your name was Doctorneedle.

f) Ms. Stevens - It's bad enough that you enter the room after my class with more energy at 8:45 in the morning than the teenagers we teach, but your impeccable dress and accessories puts my 1 10 dollar golf shirts from Modell's to shame. Although you seem to know the ins and outs of grammar and syntax - I can not but be offended that you believe that Alanis Morissette's lyrics in the song , "Ironic" actually shows irony. A black fly in my chardonnay is not ironic. It would only be ironic if that fly lived it's life fighting for the temperance movement.

g) Dr. Chester- no explanation necessary.

h) It is now midnight so I must get back to sewing my Cheerleading outfit. But I promise that there are plenty of more people I would like to bar from sending me any more work related emails.

i) As a suggestion can there be a position posting for Email Block List coordinator? I believe that plenty of other staff members would like to omit emails from others they disagree with at FHS.

Respondent admitted that he sent this email.  Respondent thought it was a joke, but now recognizes he should not have sent it.  Many of the teachers and administrators mentioned thought it was funny too.  To anyone not in on the joke, this email was without a doubt out of bounds.

The Department proved by a preponderance of the evidence that Respondent acted in a manner that was unbecoming of his position in sending this email.  Given the attitude of the recipients, I do not believe that the Department showed that it amounted to insubordination or harassment.

SPECIFICATION 4: During the 2015-2016 and/or 2016-2017 school years, the Respondent failed to adhere to the Principal's directive to stop sending the emails as described in Specification 2 and/or Specification 3

There was no directive to stop sending emails as described in Specification 3; Respondent should have known better in the first place.  It is the only one that Respondent sent.

There is also no clear direction to stop the types of emails sent in Specification 2. Principal Brown wanted to be taken off the reply all emails to which he was the original sender. Principal Chin ended up in a similar posture.  Both Principals recognized that Respondent had a right to communicate with other staffers about school related issues.  The DOE guidance and the staff handbooks do not address a situation like this, but there is nothing that seems to prohibit a public employee, like a teacher, from communicating with fellow educators about education-based issues so long as it is not disruptive to the functioning of the school or upsetting to the

individuals.  People, including the Principal's secretary, can delete emails without reading them.

However, people cannot claim they feel harassed just because they do not agree with the content

of an email that someone is entitled to send.  Respondent should have had the good manners to

take some people off the to list on some of the emails that he sent.  But the timing of the

Principals' directives is unclear, and the Department did not show that he was insubordinate by a

preponderance of the evidence.  To the extent that the Department would argue that it is conduct

unbecoming Respondent's position, I find that this charge is subsumed in the finding with

respect to Specification 2a.

To sum up, based on the proven specifications, I find that the Department has carried its

burden of proving that Respondent engaged in misconduct in the nature of conduct unbecoming

his position with respect to Specifications 2a and 3.

I also find that the charges brought by the Department were not frivolous, and they raise

genuine issues about employee email use.  I believe that if Respondent continues to use reply all

as a way to communicate genuine opinions and raise genuine issues, he will reach a point in

some situation where annoying conduct becomes disruptive enough to merit termination.

Education Law section 3020-a.4(a) directs the hearing officer to make findings of fact

and conclusions, and to choose from variety of penalties, including written reprimand, fine,

suspension for a fixed time without pay, or termination.  In considering the penalties, the hearing

officer may consider "…(T)he extent to which the (employer) made efforts towards correcting

the behavior of the employee which resulted in charges being brought under this section. through

means including but not limited to: remediation, peer intervention or an employee assistance

plan…." NY Education Law 3020-a.4(a).  According to the same section of the Education Law

3020a, the hearing officer may also impose remedial action such as a leave of absence,

continuing education and/or study, a requirement to seek counseling or treatment, or other forms
or combinations of remedial actions.

The evidence introduced did not show that any remedial actions were proposed by
administrators in the disciplinary letters provided to Respondent, other than to stop doing what
he was doing.  Respondent stopped the conduct once he was aware that he was going to get into
trouble for it.  This writer observed Respondent throughout the hearing, including his testimony,
and it is clear that he is passionate for teaching, but also eager to explain himself.  He appears to
be thoughtful enough to have reflected on what he has done to himself and his desire to help
educate children.

PENALTY

Having found that the Department has proven Respondent committed misconduct in the
incidents described in Specifications 2a and 3, there must be an appropriate penalty imposed.  In
addition to sitting at the hearing and reviewing the transcripts and exhibits received, I have
reviewed the previous decisions of Courts and other hearing officers provided to me by the
Department and the Respondent.  The Department presented some cases that resulted in
termination.  All of these involved hearing officer decisions in matters involving much more
egregious conduct than what occurred here.  Respondent's counsel cited arbitrator decisions that
look to progressive discipline issues.  I have also reflected on my experience as a hearing officer
for several years.

I believe that termination would be an excessively harsh penalty in this matter.  The
Respondent is a 21-year teacher with a good record teaching at a school with many challenges.
He has expressed recognition that he acted inappropriately in at least one of the instances, and he
clearly wants to continue teaching.  He needs to understand that he should not be wasting the

time of people who have no interest in the issues he might be raising by email.  It seems that he needs some training and education in ethics and civility in the use of social media and email. Respondent must realize that any repetition of this conduct is likely to lead to termination of his employment.

Accordingly, I determine that the proper penalty in this case is that Respondent is to be fined $500, and he is required to complete 5 hours of professional development or counseling in the area of workplace ethics and civility in social media and email usage.  The professional development, or counseling, must be approved by and be at the expense of the Department, and should take place as soon as possible, but be completed before the beginning of the second semester of the 2018-19 school year.  The fine is to be paid immediately.

AWARD

Specifications 2a and 3 insofar as they allege conduct unbecoming the profession are sustained. The Penalties for the violations proven in these Specifications are that Respondent is to be fined $500, and he is required to complete 5 hours of professional development or counseling in the area of workplace ethics and civility in social media and email usage.  The professional development, or counseling, must be approved by and be at the expense of the Department, and should take place as soon as possible, but be completed before the beginning of the second semester of the 2018-19 school year.  The fine is to be paid immediately.  The remaining Specifications and allegations are to be dismissed.  Respondent is admonished that repetition of this conduct is likely to lead to termination of his employment.

Dated: August 30, 2018
Albany, NY

_____
Donald T. Kinsella, Esq.
Hearing Officer

State of New York
County of Albany

I, Donald T. Kinsella, affirm that I am the individual described herein and that I have executed this instrument as my Opinion and Award in this matter.

_____
Donald T. Kinsella